UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO. 1:08-CV-00056-R

**WESTERN KENTUCKY COCA-COLA**
**BOTTLING COMPANY, INC.**                                                              **PLAINTIFF**

v.

**RED BULL NORTH AMERICA, INC. and**
**ROYAL CROWN BOTTLING COMPANY, INC.**                                    **DEFENDANTS**

**MEMORANDUM OPINION**

This matter comes before the Court upon Defendant Red Bull North America, Inc.'s Motion for Summary Judgment (DN 95) and Defendant Royal Crown Bottling Company, Inc.'s Motion for Summary Judgment (DN 96). Plaintiff has responded (DN 98), and Defendants have replied (DN 102 & DN 101). This matter is now ripe for adjudication. For the reasons that follow, Defendants' Motions are GRANTED.

**INTRODUCTION**

This matter arises out of the termination of a distribution agreement between Plaintiff Western Kentucky Coca-Cola Bottling Company, Inc. ("WKCC") and Defendant Red Bull North America, Inc. ("Red Bull"). Under the agreement, WKCC became a distributor within western Kentucky of beverage products produced by Red Bull. WKCC alleges that Red Bull wrongfully terminated the agreement because Red Bull did not provide WKCC with reasonable notice of termination. In the alternative, WKCC claims Red Bull was unjustly enriched by WKCC's services in connection with the agreement. WKCC also alleges that Defendant Royal Crown Bottling Company, Inc. ("RC") tortiously interfered with the agreement between WKCC and Red Bull when it began distributing Red Bull products.

**FACTUAL BACKGROUND**

On or about February 17, 2003, Clark Distributing Company ("CDC") and Red Bull executed a written Distribution Agreement, which provided that Red Bull could terminate the relationship without cause at any time, so long as thirty days written notice was provided:

> Either party may terminate this Agreement at any time, without cause, by giving written notice to the other party. Termination shall be effective 30 days after written notice is given. . . . Except as explicitly provided in this subparagraph, neither party shall be liable to the other for any losses, damages, costs or expenses resulting from a termination without cause.

The Distribution Agreement also included a "Complete Agreement" clause, which prohibited oral understandings between the parties:

> The parties desire to have all terms of their business relationship defined in this written Agreement. Neither Company nor Distributor wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different than or supplementary to the rights and obligations set forth therein. Accordingly, Company and Distributor agree that this Agreement, together with the schedules attached hereto which the parties incorporate by reference, and any other documents or agreement executed by the parties contemporaneously hereto, supersede and cancel any prior and/or contemporaneous discussions (whether described as presentations, inducements, promises agreements or any other term), between Company or anyone acting on its behalf and Distributor or anyone acting on its behalf, which might be taken to constitute agreements, representations, inducements, promises or understandings (or any equivalent to such terms) with respect to the relationship between the parties, and Company and Distributor each agree that they have placed, and will place, no reliance on any such discussions. This Agreement, together with any other documents or agreements executed by the parties contemporaneously hereto, constitutes the entire agreement between the parties and contains all of the terms, conditions, rights and obligations of the parties with respect to any aspect of the relationship between the parties. No change, modification amendment or waiver of any of the provisions hereof shall be effective and binding upon either party unless it is in writing, specifically identified as an amendment hereto and signed by the party to be charged.

The Distribution Agreement was signed by Roy Baxter, the Kentucky Division Manager of

CDC, and two Executive Vice Presidents of Red Bull.

Some time around the signing of the Distribution Agreement, Todd Thomason, Director of Sales, Midwest for Red Bull, wrote an undated letter to CDC to the attention of Baxter. The letter attempts to clarify certain issues:

> Please forgive the delay in addressing the issues you presented at the time of our discussion of the Red Bull brand in your office. The following are the individual issues you raise with some clarification. . . .
>
> 5. Termination without Cause – As mentioned previously, the Red Bull contract is standard and changes are not allowed. I will give you my word, however, that we have never terminated a distributor without significant communication and ability to fix whatever disagreements might exist. We value our distributors and understand their importance to our business. I would never terminate and [sic] agreement without doing everything in my power to rectify any issues that might exist.
>
> Roy, hopefully I have addressed your concerns. . . . We are extremely optimistic about our relationship with Clark and hopefully, now that we have had our initial sales training and you can see a little more about how Red Bull operates, you are excited about this partnership as well.

There is no dispute that the contract referred to in the letter is the Distribution Agreement. Additionally, on May 16, 2003, Thomason wrote Baxter at CDC to follow up on key points of discussion at a prior meeting. In that letter, Thomason stated that "[w]e understand that the contract with [CDC] encompasses several facilities within the contracted territory, including Western Kentucky Coca Cola in Oakland, KY" and that "[t]his was discussed and approved by Red Bull at the time of signing."

WKCC and CDC are separate corporate entities. Thomason, however, believed WKCC was a division of CDC. Red Bull never entered into a separate written Distribution Agreement with WKCC. WKCC, nevertheless, became a distributor for Red Bull.

In August 2007, Red Bull asked its distributors to promote a particular product at a

promotional price.  WKCC refused to agree to the promotional pricing.  Soon after, Red Bull met with representatives from RC regarding RC's ability to distribute Red Bull products in western Kentucky.  On September 26, 2007, Red Bull account representative Jim Stebbins sent an email to RC and another beverage distributor, Olinger Distributing Company ("Olinger"), requesting that they begin distributing Red Bull promotional products in certain Kentucky retail outlets as of October 1, 2007.  WKCC continued to distribute Red Bull products in accounts that did not carry the promotional pricing.

Harry Bigelow succeeded Thomason in November 2007.  On February 14, 2008, Bigelow signed and mailed a series of identical letters to several CDC locations terminating the Distribution Agreement between Red Bull and CDC.  On the same date, he sent a different termination letter to WKCC.  Unlike the letters to CDC, the letter to WKCC did not mention the Distribution Agreement.  Similar to the letters to CDC, the letter to WKCC stated termination would be effective March 17, 2008.  Bigelow sent another round of letters on February 21, 2008, changing the effective date of termination to March 24, 2008.

Thereafter, RC and Olinger distributed Red Bull products to accounts that had been serviced by CDC and WKCC.

## PROCEDURAL HISTORY

On March 14, 2008, WKCC filed a Complaint against Red Bull and RC in Warren Circuit Court.  Defendants removed the case to this Court on April 8, 2008.  Red Bull then moved to dismiss the case, arguing (1) the alleged contract contained no definite term, and thus was terminable at will, and (2) WKCC could not claim unjust enrichment because it alleged the existence of an explicit contract.  In response, WKCC argued that whether Red Bull gave it

"reasonable notice" was a question of fact to be decided by a jury.  Red Bull objected that the failure of reasonable notice allegation was not part of the Complaint.  The Court concluded that the Complaint provided Red Bull with fair notice of such an allegation, and allowed WKCC to proceed with its breach of contract claim, and in the alternative, unjust enrichment claim.

In support of its claims, WKCC submitted an expert report that stated "the value of the lost profits from the terminated Red Bull distribution rights held by WKCC" was approximately $8.9 million.  On September 30, 2008, Red Bull moved to strike the expert and his report because lost profits could not be recovered under either of WKCC's theories of liability.  The Court agreed, and held that the expert's testimony was not relevant to WKCC's breach of contract or unjust enrichment claims against Red Bull.  The Court explained that in Kentucky, damages for the failure to give reasonable notice of termination "may not reflect loss of a contract or discontinuance of the business relationship." *Pharo Distrib. Co. v. Stahl*, 782 S.W.2d 635, 639 (Ky. Ct. App. 1989).  The damages "must be limited to those elements directly relating to lack of notice and the lost opportunity to 'put his house in order.'" *Id.*  The Court also explained that relief for unjust enrichment does not include "the injured party's lost profit nor that part of his expenditures in reliance that resulted in no benefit to the other party." Restatement (Second) of Contracts § 344 cmt. a (1981).

Subsequently, on December 22, 2008, Red Bull moved for summary judgment and asked the court to dismiss all claims against it because WKCC had not presented any damages other than lost profits.  In response, WKCC submitted a supplemental interrogatory answer by Jimmy Briggs, a division manager for WKCC, stating that WKCC is seeking nine million dollars in damages relating the lost opportunity to put its house in order and five million dollars in unjust

5

enrichment damages. Red Bull objected, and argued the evidence of damages was still insufficient. The Court agreed. However, the Court allowed WKCC thirty days to file an expert report which itemized its damages in detail, and denied Red Bull's motion for summary judgment.

Within thirty days, WKCC provided a supplemental affidavit from Briggs detailing new damages. WKCC never filed an expert report as permitted by the Court.

Red Bull and RC have now both filed motions for summary judgment. Red Bull argues that the Distribution Agreement controls the relationship between WKCC and Red Bull, and that Red Bull complied with this agreement by giving WKCC more than thirty days notice of termination. Red Bull also argues that WKCC cannot prove an unjust enrichment claim. Additionally, Red Bull states WKCC has not proven damages related to lack of reasonable notice or unjust enrichment. Finally, RC argues that WKCC's claim of tortious interference with contract fails as a matter of law.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether

the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## ANALYSIS

### A.   Breach of Contract

Count I of WKCC's Complaint alleges that "[d]uring the calendar year 2003, WKCC and Red Bull entered into a Distribution Agreement under which WKCC became a distributor of beverage products produced by Red Bull," that "Red Bull agreed that WKCC would continue to be and would not be removed as a distributor of Red Bull products unless WKCC was unable or unwilling to distribute Red Bull products," and that "Red Bull agreed that the Distribution Agreement with WKCC would never be terminated without prior written communication . . . and

the opportunity to cure . . . ." After thoroughly reviewing the record in this matter, the Court finds that there is not evidence that such an alleged agreement existed.

In its response, WKCC emphasizes that Red Bull never entered into a written contract with WKCC, and that the Distribution Agreement was only between Red Bull and CDC, a totally separate corporate entity than WKCC. What "Distribution Agreement," then, did WKCC and Red Bull enter into in 2003, as referred to in the Complaint? According to WKCC, it distributed Red Bull product "under a verbal agreement with Red Bull beginning at the same time that CDC distributed Red Bull product . . . covered in its written agreement." WKCC points to the May 16, 2003, letter from Thomason to Baxter at CDC as proof that "WKCC was involved and distributing product for Red Bull separately from CDC." But a letter to the Kentucky Division Manager of CDC stating that Red Bull's understanding that the Distribution Agreement encompassed WKCC cannot be interpreted to support the existence of separate relationship between WKCC and Red Bull, nor is it any evidence of a verbal agreement between Red Bull and WKCC. If anything, it supports Red Bull's argument that the Distribution Agreement controls the relationship between WKCC and Red Bull.

WKCC cites the testimony of Briggs to describe the alleged verbal agreement between WKCC and Red Bull. Briggs stated that the verbal agreement was governed by the May 16 letter from Thomason to Baxter, and gave WKCC authorization to distribute Red Bull product in WKCC's "footprint." He also testified that the undated letter from Thomason to Baxter dictated that the contract had no end date, and that before termination Red Bull would provide WKCC with written notice of default and an opportunity to work out any problem.

There are many problems with WKCC's reasoning, some of which are as follows. One,

the letters were sent to Baxter at CDC. If Baxter could not bind WKCC to the Distribution Agreement because CDC and WKCC are separate entities, then a contract cannot be fashioned out of two letters between Thomason and Baxter. Two, Thomason believed WKCC was a division of CDC. He could not have intended to form a separate contract with WKCC if he believed he was communicating with CDC. Three, two letters do not create a verbal contract. WKCC never discusses when, how, or between whom a verbal agreement was made, or what the elements of that verbal agreement was. WKCC does not argue that the letters are evidence of a prior verbal agreement, it argues that the written documents are the verbal agreement. Four, Thomason's assurances to Baxter that although Red Bull does not allow changes regarding the termination without cause language in the Distribution Agreement, "we have never terminated a distributor without significant communication and ability to fix whatever disagreements might exist" and "I would never terminate and [sic] agreement without doing everything in my power to rectify any issues that might exist" do not create a binding agreement between Red Bull and WKCC such that WKCC "would not be removed as a distributor of Red Bull products unless WKCC was unable or unwilling to distribute Red Bull products," and that their relationship "would never be terminated without prior written communication of the grounds . . . and the opportunity to cure those grounds."

Nevertheless, the Court will assume for the purposes of this motion that some ongoing oral agreement existed between WKCC and Red Bull because it is undisputed that WKCC distributed Red Bull products for about five years. Therefore, as the Court held in its prior June 20, 2008, opinion, WKCC may base its breach of contract claim on the lack of reasonable notice given by Red Bull to WKCC.

9

In *Leibel v. Raynor Manufacturing Company*, the Kentucky Court of Appeals held "that reasonable notification is required in order to terminate an on-going oral agreement for the sale of goods in a relationship of manufacturer-supplier and dealer-distributor or franchisee." This court has interpreted *Leibel* to mean that "reasonable notification of termination is the only thing required for sufficient protection of either party." *Hunt Enter., Inc. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 700 (W.D. Ky. 1997). "Reasonable notice is that period of time which, under the circumstances of the case, would allow one to make alternate arrangements upon cessation of the contract and minimize losses." *Pharo Distrib. Co. v. Stahl*, 782 S.W.2d 635, 638 (Ky. Ct. App. 1989). "[W]hether reasonable notice was given under the circumstances of the case is a question of fact." *Id.* "The obvious object of the reasonable notice requirement is to afford the party losing the contract an opportunity to make appropriate arrangement in lieu thereof by dispersing inventory, adjusting work force, exploring probable alternatives, and in general, 'getting his house in order' to proceed in absence of the former relationship." *Id.*

To survive summary judgment, WKCC must "present more than a mere scintilla of evidence" that Red Bull did not provide it with a reasonable period of time to get its house in order prior to terminating their agreement. WKCC has not done so. Instead, WKCC argues that Red Bull did not properly terminate their agreement because it did not give WKCC an opportunity to correct any perceived performance issues. WKCC, however, has not shown that an opportunity to cure was part of any agreement, nor is it imposed by law. Consequently, the Court finds that WKCC's breach of contract claim fails because it has not provided any evidence that Red Bull did not give it reasonable notice in terminating their agreement.

Furthermore, WKCC has failed to provide sufficient proof of damages. On May 15,

2009, the Court found WKCC had not submitted sufficient proof of damages, but allowed it thirty days to file an expert report which itemizes its damages in detail. WKCC never did so. Instead, it provided a supplemental affidavit from Briggs detailing new damages. In this affidavit, Briggs testified that WKCC suffered $385,723.13 in damages building the Red Bull brand in the region and $176,655.13 to restock shelves, replace coolers, and store equipment. These damages, however, are not related to the amount of notice Red Bull gave WKCC before terminating their agreement. Briggs admitted as much in his deposition on August 18, 2009, conceding that WKCC would have suffered those costs even if Red Bull had given WKCC six months notice of termination. Thus, these damages cannot support WKCC's breach of contract claim. *See Pharo*, 782 S.W.2d at 639 ("Since it is the failure to give reasonable notice of termination rather than the termination of the contract itself which constituted the breach, the damages must, of necessity, be attuned to this failure. The damages may not reflect loss of a contract or discontinuance of the business relationship."). Briggs also admitted that the $385,723.13 was for past expenses and that he could not offer any evidence to support the other alleged damages because he pulled them "out of the air." Past expenses are not recoverable. *See id.* Neither are expenses based on pulling numbers out of the air. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1999).

In sum, WKCC's breach of contract claim against Red Bull fails.

**B.     Unjust Enrichment**

Count II of WKCC's Complaint pleads an unjust enrichment claim in the alternative. For WKCC to prevail under a theory of unjust enrichment, it "must prove three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by

defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, No. 2008-CA-002006-MR, 2009 WL 3321370, at *3 (Ky. Ct. App. Oct. 16, 2009). In other words, unjust enrichment "is applicable as a basis of restitution to prevent one person from keeping money or benefits belonging to another." *Haeberle v. St. Paul Fire & Marine Ins. Co.*, 769 S.W.2d 64, 67 (Ky. Ct. App. 1989). The doctrine of unjust enrichment, however, does not apply when the parties have an explicit contract. *Codell Construction Co. v. Kentucky*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977).

WKCC has not argued, even in the alternative, that it did not have an explicit contract with Red Bull. In fact, it argues that its proof of unjust enrichment "will be that it performed its obligations under the verbal agreement with Red Bull satisfactorily and in good faith." WKCC's unjust enrichment claim could fail because of this alone. WKKC has also not shown, however, that Red Bull retained a benefit without payment for its value.

In his supplemental affidavit, Briggs testified that it suffered about $3.8 million in unjust enrichment damages. Briggs later testified that he calculated this number by taking "into account the profits that were generated by Red Bull and what the loss of those profits– how it affected the value of [WKCC]." He did this by taking WKCC's gross profit margin and multiplying it by 9.5. In other words, the $3.8 million is for WKCC's lost profits. WKCC has not shown that Red Bull did not pay it for the services it performed while distributing Red Bull products.

In sum, WKCC's claim of unjust enrichment against Red Bull fails.

### C. Tortious Interference Of Contract

In Count III of its Complaint WKCC alleges RC "tortiously interfered with the contractual agreement between WKCC and Red Bull when it commenced distribution of Red Bull products." Kentucky follows the Restatement (Second) of Torts § 766, which states the legal requirements of a claim of intentional interference with performance of contract by a third person as follows:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*See Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 533 (Ky. Ct. App. 2005). Thus, the parties agree that for WKCC to prove its claims of tortious interference, it must prove: "(1) the existence of a contract; (2) Defendant's knowledge of this contract; (3) Defendant intended to cause its breach; (4) Defendant's conduct caused the breach; (5) this breach resulted in damages to Plaintiff; and (6) Defendant had no privilege or justification to excuse its conduct." *See Dennison v. Murray State Univ.*, 465 F. Supp. 2d 733, 755 (W.D. Ky. 2006).

The Court finds that Red Bull has not presented sufficient evidence on any of these elements. *See, e.g.*, Restatement (Second) § 768(1), especially Comment *i*. Most importantly, as the Court already concluded, WKCC has not demonstrated Red Bull improperly terminated the contract. WKCC cannot prove its claim of tortious interference because it has not shown Red Bull breached the alleged contracted with WKCC. *See Monin v. Wal-Mart Real Estate Bus. Trust*, No. 2007-CA-000781-MR, 2008 WL 352346, at *2 (Ky. Ct. App. March 31, 2008).

## CONCLUSION

For the foregoing reasons, Defendant Red Bull's Motion for Summary Judgment (DN 95) is GRANTED and Defendant RC's Motion for Summary Judgment (DN 96) is GRANTED. An appropriate order shall follow.